# In the United States Court of Federal Claims

Nos. 23-2128, 24-1418, 24-1575
(Filed Under Seal: July 24, 2025)
Reissued: August 14, 2025*

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
                               \*

**MAYVIN, INC., et al.,**  \*
                               \*
                     **Plaintiffs,**  \*
                               \*
      v.  \*
                               \*
**THE UNITED STATES, et al.,**  \*
                               \*
                     **Defendants,**  \*
                               \*
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

*Stephanie D. Wilson*, with whom were *Rachael C. Haley* and *Charles L. Bonani*, Berenzweig Leonard, LLP, all of McLean, VA, for Plaintiff Mayvin, Inc.

*Patrick B. Kernan*, Asmar, Schor and McKenna, of Washington, D.C., for Plaintiff Technical and Project Engineering, LLC.

*Craig A. Holman*, with whom were *Kara L. Daniels* and *Thomas A. Pettit*, Arnold and Porter Kaye Scholer LLP, all of Washington D.C. for Plaintiff StraCon Services Group, LLC.

*Joseph A. Pixley*, Senior Trial Counsel, with whom were *Joshua A. Mandelbaum*, Senior Trial Counsel, *Steven J. Gilligham*, Assistant Director, *Patricia M. McCarthy*, Director, and *Brian M. Boynton*, Principal Deputy Assistant Attorney General, Commercial Litigation Branch, Civil Division, Department of Justice, all of Washington, D.C., for the government, and *Jules L. Szanton*, Major, U.S. Army, Trial Attorney, Contract Litigation and Intellectual Property Division, U.S. Army Legal Services Agency, of Fort Belvoir, VA, of counsel.

*Allen L. Anderson*, F and B Law Firm, PC, of Huntsville, AL for Defendant-Intervenor Advanced Technology Leaders, Inc.

---

\* Pursuant to the protective order entered in this case, this opinion was filed initially under seal. The parties did not provide any proposed redactions of confidential or proprietary information; however, the Court did make minor typographical and stylistic corrections to this version of the opinion.

## OPINION AND ORDER

**SOMERS**, Judge.

As former Secretary of Defense Donald Rumsfeld once remarked, "you go to war with the Army you have . . . not the Army you want or wish to have at a later time." Thomas E. Ricks, *Rumsfeld Gets Earful from Troops*, WASH. POST (Dec. 9, 2004).[1] In this case, the government came to court with the rationale it wanted or wished it had rather than the one the Army actually provided at the time it cancelled the solicitation at issue in this protest. In this bid protest, the Army justified the cancellation of its solicitation on grounds outlined in its decisional documents. But during litigation, the government attempted to refine and tweak the Army's original reasoning. Moreover, the government asserted that the Army "just need[ed] to have *any* reason to have a different strategy" to justify its decision. ECF No. 94 at 126:13–14 (emphasis added). However, the government must stand by the Army's original reasoning, not the reasoning it wants or wishes it had. And if the original reasoning fails, the government's case must fail. For that reason and the other reasons that follow, the Court determines that the protestors succeed in this bid protest and enjoins the government from cancelling the Systems Engineering and Technical Assistance ("SETA III") solicitation in a manner inconsistent with this opinion.

## BACKGROUND

### A.    Factual Background

On September 15, 2021, the Army Contracting Command-Orlando ("agency") issued Request for Proposal ("RFP") No. W900KK-21-R-0035 for SETA III to support the Program Executive Office for Simulation, Training and Instrumentation ("PEO STRI"). Tab 2j at AR 442; Tab 2a at AR 33. The agency intended to procure SETA III as a set-aside for women-owned small businesses and as a single-source indefinite duration/indefinite quantity ("IDIQ") contract with a task order limit of $365 million. Tab 2j at AR 442–43, 474. PEO STRI's mission "is to develop, acquire, provide, and sustain simulation, training, testing and modeling solutions to optimize warfighter readiness." Tab 2a at AR 33. Major PEO STRI programs include "the Synthetic Training Environment (STE), Persistent Cyber Training Environment (PCTE), International Programs Office (IPO), Instrumentable Multiple Integrated Laser Engagement System (I-MILES), [and] Medical Simulation, and Army Training Aids, Devices, Simulators and Simulations (TADSS) Maintenance Program." *Id.* To support these programs, PEO STRI relies on SETA services "to conduct its mission in all phases of life cycle management . . . because insufficient government personnel are authorized for hire within the organization to successfully perform the required mission." Tab 2 at AR 4. Consequently, "[t]he required scope of performance . . . for SETA personnel is intentionally broad covering administrative, support functions, and technical work for all programs within PEO STRI." *Id.* at AR 5.

---

[1] https://www.washingtonpost.com/archive/politics/2004/12/09/rumsfeld-gets-earful-from-troops/ec74b055-5090-496b-a66c-145d37a79473/.

PEO STRI has acquired SETA services through single award contracts since April 2004. Tab 9 at AR 610. Because of "several performance issues resulting from the GSA's contract administration and issuance of new Office of the Secretary of Defense (OSD) policy," in November 2009 the agency began to directly procure SETA services as IDIQ small business set-asides through SETA I and SETA II and transitioned away from the previous multiple award and single award Blanket Purchase Agreement acquisition strategies. *Id.* at AR 610, 611. Despite the Competition in Contracting Act's preference for multiple awards, SETA III, like SETA I and SETA II, was solicited as a single-source IDIQ contract. Tab 2j at AR 443. In its 2021 market research report, the agency's acquisition team considered the possibility of acquiring SETA services through an alternate contract vehicle; however, the acquisition team found that the single-source contract vehicle was superior to other options given the scope of the SETA contract and PEO STRI's needs. Tab 9 at AR 611–12. The agency reasoned that:

> It is unlikely that another entities' contract would provide the depth and breadth of services to be performed under the resultant SETA contract, which includes nineteen distinct functional areas ranging from administrative, security and program management support to engineering support services and would then require PEO STRI to have and manage multiple contracts where one contract has sufficed for more than twenty years.

> Utilizing another entities' contract would not provide the Contractor level of understanding of the depth and breadth of PEO STRI's SETA support services requirements, level of rapid response required, or dedicated onsite program management and oversight as currently executed.

*Id.* at AR 612. Ultimately, the acquisition team recommended that PEO STRI "pursue [SETA III] as a [Woman Owned Small Business] solicitation" and execute "a standalone, Single Award ID/IQ contract vehicle to satisfy PEO STRI's SETA support requirements, because the alternative contract vehicles identified during market research cannot sufficiently meet PEO STRI's needs." *Id.* at AR 616.

Subsequently, pursuant to FAR 16.504(c)(1)(ii)(D)(1)(i), the agency's Head of Contracting Activity ("HCA") authorized the solicitation of a single-source IDIQ award for SETA III because he determined that "the task order requirements are so integrally related that only a single-source can reasonably perform the work." Tab 18 at AR 1248. In reaching this decision, the HCA considered both the 2021 market research report and PEO STRI's procurement history. *Id.* at AR 1243. The HCA reasoned that "[o]ne prime contractor managing all PEO STRI Task Orders provides the most efficient means to satisfy the SETA requirements across the organization" because PEO STRI's mission "creates dependencies between PMOs, which . . . requires the shifting of resources including SETA contractor personnel." *Id.* at AR 1244, 1243–44. Furthermore, the HCA noted that the agency has considered using a multiple award contract for the SETA program, but the HCA found that:

> (1) A MA ID/IQ contract would negate efficiencies gained from a single-source ID/IQ and would cost more in terms of personnel, processes, and

overhead . . . .  The Government would also not realize cost efficiencies across task orders due to the duplication of program management and functional support.

(2)  Consideration was given as to whether efforts could be effectively split among multiple contractors through a MA ID/IQ contract.  Possibilities considered included awarding organizationally (i.e., program office), functionally (i.e., discipline) or by domain, but each possibility presented challenges that would impede PEO STRI's mission to be the U.S. Army's acquisition Center of Excellence (COE) for training and testing solutions . . . .  Attempting to divide PEO STRI's task orders across more than one contract will marginalize PEO STRI's ability to establish an integrated and interoperable COE.

(3)  A MA contractor approach will impede the critical and necessary nature of uninterrupted support services.  Additional schedule risks related to timely execution are specifically introduced due to the additional solicitation process that would be required prior to awarding each new task order and the redundant programmatic overviews and meetings conducted with each different contractor . . . .

(4)  A single prime contractor, with insight into the overall SETA positional blueprint supporting emerging or decreasing requirements, provides the most fiscally responsible and efficient path forward by allowing for cost optimization opportunities and reallocation and/or sharing of resources . . . .  Utilization of single-source ID/IQ, instead of a MA ID/IQ can mitigate risk by preventing multiple contractors from competing for the same small manpower pool which would ultimately fragment cooperation among the contractors and the workforce.

*Id*. 1244–46.  Accordingly, the HCA determined that the single-source IDIQ approach would be most beneficial to the program's mission, schedule, and costs, *see id*. at AR 1246–47, while a multiple award approach "would result in more resources (money, time and personnel) to be expended when a single-source ID/IQ contract would be more efficient," *id*. at AR 1247.

Consequently, in September 2021, the agency issued the RFP for SETA III as a single-source IDIQ.  Tab 2j at AR 442–43.  In response, the agency received seventeen proposals from offerors, including, as relevant to this protest, from Mayvin, StraCon, Technical Assistance and Project Engineering ("TAPE"), and Advanced Technology Leaders ("ATL").  Tab 1 at AR 1; Tab 19 at AR 1249.  According to the RFP, the contract would be awarded on a best value, subjective tradeoff basis.  Tab 2j at AR 531.  The RFP considered four evaluation factors presented in descending order of importance: Management Approach, Initial Task Order Approach, Past Performance, and Price.  *Id*.  The RFP also included a section describing Organizational Conflicts of Interest ("OCIs").  *Id.* at AR 525–26.  According to this section of the RFP, the contracting officer could "not award a contract until he determine[d] that no [OCI] exists or any conflict of interest [was] reasonably resolved."  *Id*.  Every offeror was to "assess whether there is an [OCI] associated with the proposal it submits . . . [and] explain the actions it intends to use to resolve any [OCIs] it finds."  *Id.* at AR 526.  Ultimately, on June 5, 2023, the agency awarded SETA III to ATL.  Tab 19 at AR 1249.

**B.    Procedural History**

**1.    Initial Post-Award Protests, Remand, and the Army's Remand Decision**

In response to the agency's award of SETA III to ATL, numerous offerors challenged the award at both the Government Accountability Office ("GAO") and the U.S. Court of Federal Claims. *See* Complaint, *Mayvin, Inc. v. United States*, No. 23-cv-1019 (Fed. Cl. June 30, 2023), ECF No. 1; Complaint, *WILL Tech. Inc. v. United States*, No. 23-cv-930 (Fed. Cl. June 20, 2023), ECF No. 1; Complaint, *StraCon Servs. Grp. v. United States*, No. 23-cv-1040 (Fed. Cl. July 5, 2023), ECF No. 1; *see also* ECF No. 1 ¶ 96.   After reviewing these protests, the government requested that the Court remand this case to the agency so that the contracting officer could "(1) investigate allegations of an [OCI] concerning [ATL], raised in [StraCon's] complaint; and (2) review the [agency's] compliance with [FAR] 52.222-46 in light of the allegations raised by StraCon, and take appropriate actions (if any) that the contracting officer deems necessary."  ECF No. 1-7 at 1.   On August 25, 2023, following briefing on the government's motion, the Court granted the government's motion to remand.  Remand Order, *WILL Tech*, No. 23-cv-930 (Fed. Cl. Aug. 25, 2023), ECF No. 34.   The Court directed the agency to investigate the OCI allegations, review the agency's compliance with FAR 52.222-46, and take appropriate actions the agency deemed necessary.  *Id.* at 3.

On October 31, 2023, the government filed a notice of the agency's remand decision. ECF No. 1-9.  Therein, the government reported that the contracting officer found that "[t]he award to ATL was improper, in light of the potential for an OCI involving Seneca."  *Id.* at 2. Accordingly, the contracting officer determined that "the decision to award the contract to ATL is rescinded, and the contract executed with ATL will be terminated for convenience."  *Id.* Additionally, the contracting officer decided that "the [RFP] must be amended to increase at least some, if not all, of the labor rates provided in [the] RFP," to ensure compliance with FAR 52.222-46.  *Id.*  Consequently, the contracting officer determined that the agency would amend the RFP and "offerors in the competitive range at the time the original award decision was made (including ATL) [would] be allowed an opportunity to amend all aspects of their proposals."  *Id.* On December 7, 2023, pursuant to Rule 41(a)(1)(A)(i) of the Rules of the U.S. Court of Federal Claims ("RCFC"), Mayvin dismissed its complaint without prejudice based on the corrective action set forth in government's notice.  Notice of Voluntary Dismissal, *WILL Tech*, No. 23-cv-930 (Fed. Cl. Dec. 7, 2023), ECF No. 47.

Shortly thereafter, on December 15, 2023, Mayvin filed a new complaint challenging the agency's remand decision.  ECF No. 1.  In its motion for judgment on the administrative record ("MJAR"), Mayvin alleged, *inter alia*, that the contracting officer had violated FAR 9.506 by failing to obtain approval from the chief of the contracting office for his proposed remedy.  ECF No. 36-1 at 20–21.  Instead, the contracting officer "simply accepted ATL's proposed remedy without further evaluation or analysis."  *Id.* at 20.  In response, on February 7, 2024, the government filed a notice of corrective action.  ECF No. 37.  In its notice, the government represented that the contracting officer would "rescind[] his October 12, 2023 OCI assessment, and forward[] his written findings 'along with recommendations regarding the OCI to the chief of the contracting office to make a final decision,' in accordance with FAR 9.506."  ECF No. 37 at 2 (quoting ECF No. 37-1 at 1).  Therefore, the Court stayed the case "until the [agency] can

complete the corrective action described in the notice of corrective action" and ordered the
government to inform the Court of the agency's "final decision on the corrective action."  ECF
No. 46.

## 2. The Army's Cancellation Decision

According to the government, the agency decided during this second remand period that
it no longer wanted to pursue a single-source IDIQ acquisition strategy for fulfilling its SETA
requirements and would cancel the solicitation altogether.  ECF No. 77 at 7–8.  In a June 2024
memorandum, the source selection authority explained the reasons for the agency's change in
position regarding the SETA requirement.  *See* Tab 18 at AR 1231–40.  The source selection
authority stated that "[i]n the process of investigating the alleged OCI [with Seneca], the
contracting and program team realized that the single-source IDIQ approval may have included
factual statements that are not consistent with the contracting practices currently in place."  *Id*. at
AR 1232.  As part of this investigation, the contracting officer ordered the completion of an
updated market research report.  *Id*.  This report was to focus on two questions:

> a.  Does the SETA service requirement at PEO STRI require a single SETA
> service contract provider because the service requirements are "so integrally
> related" that only a single source ID/IQ could meet the organization's needs?  If
> not, does the statutory preference for multiple vendors apply?

> b.  Assuming the statutory preference for multiple award contract applies,
> would the pool of vendors for a multiple award strategy ID/IQ be different from the
> pool of vendors for the current Single Source ID/IQ contract?  In essence, would
> the changes to the amended Request for Proposal (RFP) converting it to a multiple
> award strategy be so substantial as to exceed what prospective offerors reasonably
> could have anticipated, so that additional sources likely would have submitted
> offers had the substance of the amendment been known to them?

*Id*. at AR 1234; *see also* Tab 17 at AR 1144.

With regard to the first question, the report "found that PEO STRI utilizes a number of
service contract providers for services similar to those advertise[d] under SETA III[,] [a]lthough
some of the contracts identified in [the] search did not meet the reviewer's definition of SETA
services."  Tab 17 at AR 1146.  In total, the agency discovered that PEO STRI had seven
contracts wherein "the work statements supporting the contract are deemed similar to the
services to be provided by the single source SETA enterprise contract."  *Id*. at 1146–47.  These
"SETA-type" contracts included support for the Financial Improvement Audit Readiness
Services and communications and graphic design work for Cyber Research, Development and
Operations Support.  *Id*. at AR 1147.  The agency "sought to identify an explanation for the
existence of such contracts given the rationale for a single source award as described in the
statutorily required Determination and Finding (D&F)."  *Id*. at AR 1148.  During its
investigation, the agency found that "the routine management of the SETA contract has been
completed at the PEO STRI staff level away from the Program Management offices at PEO
STRI . . . [leading] to various program offices seeking alternative contracts from multiple

contracting organizations to satisfy service contract needs." *Id*. The agency explained that these SETA-type contracts stemmed from "absence of controls in the overall process result[ing] in approval of service contract actions without full consideration of the impact on the organization's acquisition strategy as a whole." *Id*. According to the agency, the facts uncovered during the OCI investigation and drafting of the market research report undermined the reasoning in the D&F memorandum for authorizing the single-source IDIQ acquisition strategy in the first place. *Id*. Specifically, the report found that the following statements from the D&F "do not seem supportable" considering the facts:

| Page | Statement |
|------|-----------|
| 4 | The Government considered the use of a MA contract. Awarding multiple contracts for severable, distinct efforts for continuing SETA requirements would not allow PEO STRI to effectively and efficiently fulfill its role as the critical lead in ensuring all training and testing solutions are appropriately integrated and synchronized across the Army. |
| 4 | A MA ID/IQ contract would require more manpower resources currently dedicated to procure and manage multiple contractors. |
| 4 | Possibilities considered included awarding organizationally (i.e. program office), functionally (i.e., discipline) or by mission to the [COE] for training and testing solutions. In order to continue successfully implementing integration and interoperability across the COE, PEO STRI requires a single SETA contractor to provide not only a comprehensive solution for each task order but for the PEO in its entirety. |
| 4 | Attempting to divide PEO STRI's task orders across more than one contract will marginalize PEO STRI's ability to establish an integrated and interoperable COE. |
| 5 | Since all aspects of PEO STRI programs' lifecycles are supported by SETA services, utilizing multiple contractors allows for deviations in solutions presented amongst the contractors, thus affecting multiple stages of a program. This could result in significant delays or non-availability of critical training devices and instrumentation currently supported by PEO STRI . . . |
| 5 | If the single award approach was not approved, cost, and performance of the SETA III effort would be negatively impacted. |
| 6 | Utilization of single source ID/IQ, instead of a MA ID/IQ can mitigate risk by preventing multiple contractors from competing for the same manpower pool which would ultimately fragment cooperation among the contractors and the workforce. |

*Id*. AR 1148–49 (alterations in original) (quoting Tab 18 at AR 1244–46).

With regard to the second question, the agency found that amending the RFP and converting SETA into multiple awards would result in a larger pool of offerors than the original seventeen offerors because the "$395M requirement likely acted as a barrier to competition for other companies unwilling to compete for a contract of this size." *Id*. at AR 1149. This conclusion was based on the "review of the SETA III competitive pool, GSA OASIS, ACC-RSA contracts (EXPRESS), and other SETA-type contracts within PEO STRI as well as reviewing

current market conditions through SAM.gov and Vantage." *Id*. at AR 1151. Thus, the agency determined that soliciting the SETA III requirements under a multiple source approach would constitute an amendment "so substantial as to exceed what prospective offerors reasonably could have anticipated, so that additional sources likely would have submitted offers had the substance of the amendment been known to them." *Id*. at 1152. The report recommended that the contracting officer "cancel the original solicitation and issue a new one, regardless of the stage of the acquisition," under FAR 15.206(e). *Id.*

On June 12, 2024, the source selection authority decided to cancel the SETA III solicitation pursuant to FAR 15.305(b) based on the findings of the market research report:

> The Market Research Report Update confirmed that PEO STRI utilizes multiple SETA service contract providers across the organization instead of relying on a single contractor to provide SETA services for the organization in its entirety. The existence of multiple SETA service contract providers is not consistent with the arguments used to justify the award of the SETA III contract as a single award IDIQ contract. While the Market Research Report Update suggests cancelling the solicitation and issuing a new one as a multiple award effort pursuant to FAR 15.206(e) would be an appropriate remedy, I think such an approach is not in the best interests of the Government. As the appointed Source Selection Authority (SSA) for the SETA III procurement, I reject all SETA III proposals per FAR 15.305(b). An acquisition strategy seeking multiple vendors will require consideration of issues/questions not addressed in the single award acquisition strategy. To amend the solicitation without doing the necessary analysis for each requirement is not in the best interests of the Government. Given that, I reject all proposals in response to the SETA III solicitation and direct the Contracting Officer to cancel the procurement.

Tab 18 at AR 1232, 1240. The source selection authority agreed with the updated market research report that the existence of these SETA-type service contracts undermined the justification for soliciting these services as a single-source award. The source selection authority considered four options to remedy the situation: "a. Terminate competing service contracts. . . . b. Amend the SETA III RFP to convert to a multiple award, and release amendment to offerors currently in the competitive range. . . . c. Cancel RFP and Resolicit as a multiple award IDIQ contract to all eligible offerors. . . . [or] d. Reject All Proposals, Cancel RFP and Require Each Segment of the Enterprise to Develop a Plan to Meet its Service Contract Needs." *Id.* at AR 1238–39 (emphases omitted). Ultimately, the source selection authority decided to adopt the last option and "reject all proposals in response to the SETA III solicitation and direct the Contracting Officer to cancel the procurement." *Id*. at AR 1239. In support of the cancellation decision, the source selection authority referred to the updated market research report that stated that the existence of SETA-type contracts across PEO STRI undermined the original reasoning for the solicitation of a single-source award. *Id*. at AR 1237. Specifically, the source selection authority found that "[t]he use of multiple service providers, while helpful to the mission, is not in line with the argument as stated in the D&F that PEO STRI requires a single SETA contractor to provide a comprehensive solution for the PEO STRI in its entirety." *Id*. The source selection authority then cited to the list statements from the D&F that the market research report found

"are not supportable" given the existence of SETA-type contracts outside of the SETA procurements, *id*. at AR 1237–38, and concluded that "[t]he need for a single award IDIQ contract is no longer supportable by the facts," *id.* at AR 1240.

### 3. Subsequent Protests

On the same day, after receiving the source selection authority's decision, the contracting officer sent a memorandum to the senior contracting official seeking approval to cancel the SETA III procurement.  Tab 19 at AR 1249–55.  The contracting officer stated that he "agree[d] with the decision of the [source selection authority] to reject all proposals in the best interest of the Government pursuant to FAR 15.305(b), and [] agree[d] with [the source selection authority's] direction to cancel the solicitation."  *Id*. at AR 1254.  Moreover, the contracting officer concluded that terminating ATL's award for convenience and cancelling the SETA III procurement would "appropriately resolve the pending OCI issue."  *Id*. at AR 1254–55.  Subsequently, in his June 2024 memorandum, the senior contracting official approved the source selection authority's decision and concluded that "termination of ATL's award, the rejection of all proposals and cancellation of the RFP pursuant to FAR 15.305(b), would appropriately resolve the identified OCI issue."  Tab 20 at AR 1275.

On July 2, 2024, the government filed a notice of corrective action and informed the Court that the agency's acting senior contracting official had "decided that rejection of all proposals, cancellation of the solicitation, and termination of the award to ATL for convenience, will appropriately resolve the potential OCI involving Seneca."  ECF No. 49 at 1.  While the agency contended that its corrective action rendered Mayvin's complaint moot, Mayvin asserted that "the [agency] did not take the corrective action set out in its Notice of Correction Action . . ." and that "the [agency's] decision to cancel the Solicitation as a remedy for the OCI raises additional claims that necessitate further litigation."  ECF No. 50 at 4, 2, 3.  Consequently, Mayvin filed a supplemental complaint with leave of the Court, which included new allegations challenging the agency's cancellation decision.  ECF No. 63 ¶¶ 169–225.  StraCon and TAPE, who were also unsuccessful offerors, filed new protests challenging the cancellation of the solicitation.  Complaint, *StraCon*, No. 24-cv-1418 (Fed. Cl. Sept. 10, 2024), ECF No. 1; Complaint, *Tech. & Project Eng'g, LLC v. United States*, No. 24-cv-1575 (Fed. Cl. Oct. 4, 2024), ECF No. 1.  The Court consolidated these new protests and designated the instant case as the lead case.  Consolidation Order, *StraCon*, No. 24-cv-1418 (Fed. Cl. Sept. 19, 2024), ECF No. 14; Consolidation Order, *Tech. & Project Eng'g*, No. 24-cv-1575 (Fed. Cl. Oct. 9, 2024), ECF No. 11.  Mayvin's supplemental complaint alleges eleven counts, StraCon's complaint alleges seven counts, and TAPE's complaint alleges three counts.  ECF No. 63; Complaint, *StraCon*, No. 24-cv-1418 (Fed. Cl. Sept. 10, 2024), ECF No. 1; Complaint, *Tech. & Project Eng'g*, No. 24-cv-1575 (Fed. Cl. Oct. 4, 2024), ECF No. 1.  Following a status conference with the parties, the Court entered a scheduling order "for the filing of cross-motions for judgment on the administrative record *limited to the issue of whether the agency's cancellation of the solicitation at issue was in accordance with the standards set forth in 5 U.S.C. § 706.*"  ECF No. 66 at 1.  Thus, at this stage of the protest, the Court considers only the counts in Plaintiffs' complaints

that address whether the agency's cancellation decision comports with the Administrative Procedure Act ("APA") standard of review.[2]

Plaintiffs' remaining counts within the scope of the Court's order and addressed in Plaintiffs' MJARs can be divided into three main grounds.  First, StraCon contends that the cancellation violates FAR 19.502-9.  ECF No. 74-1 at 21–23.  StraCon alleges that the agency failed to observe the mandatory requirements related to withdrawal of a small business set-aside outlined in FAR 19.502-9 before reaching its decision.  *Id.* at 22.  Second, Plaintiffs allege that the agency's decision lacks a rational basis.  *Id.* at 35.  Also under this argument, StraCon separately argues that the agency's decision was pretextual and made to avoid litigation.  *Id.* at 31–34.  Furthermore, Mayvin asserts "that the [agency's] actions violated its duties under FAR 1.102(b)(3), FAR 1.102-2(c), and FAR 1.602-2(b) to conduct a fair procurement."  ECF No. 79 at 15.  Third, Plaintiffs allege that the cancellation decision is unlawful because it violates 10 U.S.C. § 3301(b).  ECF No. 72-1 at 27–28; ECF No. 73-1 at 21–24; ECF No. 74-1 at 18–21.

The Court held oral argument on the pending motions.  Thus, this matter is now ripe for consideration.

## DISCUSSION

### A.    Legal Standard

The Tucker Act, as amended by the Administrative Dispute Resolution Act, provides the Court of Federal Claims with "jurisdiction to render judgment on an action by an interested party objecting to . . . the award of a contract or any alleged violation of statute or regulation in connection with a procurement . . . ."  28 U.S.C. § 1491(b)(1).  In exercising this bid protest jurisdiction, the Court "review[s] the agency's decision pursuant to the standards set forth in section 706 of title 5," 28 U.S.C. § 1491(b)(4), which requires the Court to "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2).  To succeed in a bid protest, a protestor must make two showings.  *Bannum, Inc. v. United States*, 404 F.3d 1346, 1351 (Fed. Cir. 2005).  First, a protestor must show error, meaning that the agency violated the APA standard.  *Id.*  Second, a protestor must demonstrate that such error was prejudicial.  *Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed. Cir. 1996).

---

[2] Accordingly, the Court does not decide TAPE's Counts I and II, which deal with the agency's actions based on the OCI investigation.  *See* Complaint, *Tech. & Project Eng'g*, No. 24-cv-1575 (Fed. Cl. Oct. 4, 2024), ECF No. 1.  The Court does not address Mayvin's Counts I, II, III, VIII, and IX, which deal with the agency's OCI decision, the revised benchmark labor rates, and the contracting officer's purported "alternative justification" for cancellation.  *See* ECF No. 63.  And finally, the Court does not address StraCon's Counts VI and VII that discuss the OCI issue and the agency's announced decision to allow ATL to remain in the competition.  *See* Complaint, *StraCon*, No. 24-cv-1418 (Fed. Cl. Sept. 10, 2024), ECF No. 1.  These counts are outside of the scope of briefing ordered by the Court.  *See* ECF No. 66.

To demonstrate that an agency's actions were in error, a protestor must establish that the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [the decision] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Ala. Aircraft Indus., Inc.-Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (alteration in original) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). Accordingly, a procurement decision may be set aside if the protestor proves that "(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1358 (Fed. Cir. 2009) (quoting *PGBA, LLC v. United States*, 389 F.3d 1219, 1225 n.4 (Fed. Cir. 2004)). A protestor must then show that this conduct constituted "a significant, prejudicial error in the procurement process." *WellPoint Mil. Care Corp. v. United States*, 953 F.3d 1373, 1377 (Fed. Cir. 2020) (quoting *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed. Cir. 1999)). In other words, a protestor must demonstrate that it would have had "a 'substantial chance' . . . [of] receiv[ing] the contract award but for the [agency's] errors." *Bannum*, 404 F.3d at 1358.

Generally, bid protests are decided on cross-motions for judgment on the administrative record under RCFC 52.1. In deciding a motion for judgment on the administrative record, the Court "make[s] factual findings from the record evidence as if it were conducting a trial on the record." *Bannum*, 404 F.3d at 1354. Thus, the Court assesses "whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record." *A & D Fire Prot., Inc. v. United States*, 72 Fed. Cl. 126, 131 (2006). Put differently, "in a bid protest, the court reviews the agency's procurement decision to determine whether it is supported by the administrative record." *PAE Applied Techs., LLC v. United States*, 154 Fed. Cl. 490, 504 (2021).

## B. Analysis

As set forth above, Plaintiffs protest the agency's cancellation decision on three main bases. First, StraCon asserts that the agency's cancellation decision violated the restrictions in FAR 19.502-9 on the withdrawal of a small business set-aside. ECF No. 74-1 at 21–23. Second, Plaintiffs allege that the reasoning behind the cancellation decision lacked a rational basis. *Id.* at 34–36; ECF No. 73-1 at 31; ECF No. 72-1 at 27. Third, Plaintiffs allege that the agency's cancellation decision was not in accordance with 10 U.S.C. § 3301(b). ECF No. 74-1 at 18–21; ECF No. 73-1 at 21–24; ECF No. 72-1 at 27–28. For the reasons that follow, the Court finds that agency's actions were in error and that these errors prejudiced Plaintiffs. The Court addresses each argument in turn.

1.      **The Agency's Decision to Cancel the Solicitation Was Not in Accordance with Law Because It Violated FAR 19.502-9.**

To begin, StraCon contends that the agency's cancellation decision was unlawful because it violated FAR 19.502-9.  ECF No. 74-1 at 21–23.  This FAR provision provides that

> If, before award of a contract involving a total or partial small business set-aside, the contracting officer considers that award would be detrimental to the public interest (e.g., payment of more than a fair market price), the contracting officer may withdraw the small business set-aside, whether it was unilateral or joint.  The contracting officer shall initiate a withdrawal of an individual total or partial small business set-aside, by giving written notice to the agency small business specialist and the SBA PCR . . . stating the reasons.

48 C.F.R. § 19.502-9(a).  Moreover, it specifies that "[i]f the agency small business specialist does not agree to a withdrawal or modification, the case shall be promptly referred to the SBA PCR . . . for review."  48 C.F.R. § 19.502-9(b).  StraCon alleges that the contracting officer, despite finding "that an award 'would be detrimental to the public interest,'" failed to notify the agency's small business specialist and the SBA Procurement Center Representative ("PCR") of the reasons for cancelling the procurement as required by the FAR.  ECF No. 74-1 at 22 (quoting FAR 19.502-9(a)).  Additionally, StraCon asserts that the cancellation also violated the directive in FAR 19.201(a) "to provide maximum practicable opportunities in its acquisitions to . . . women-owned small businesses."  *Id.* at 21. (alteration in original) (quoting FAR 19.201(a)).  According to StraCon, the administrative record "lacks any indication that the Agency even identified these mandatory requirements, much less that the Agency considered its 'maximum practicable opportunities' obligation as part of the cancellation process or consulted with the small business specialist or PCR."  *Id.* at 22.

In response, the government counters that FAR 19.502-9 applies "*only if* the [agency] were seeking to withdraw from the small business set-aside and open the competition to other-than-small businesses."  ECF No. 77 at 32.  Thus, according to the government's interpretation, the *cancellation* of a solicitation that is set aside for small businesses does not constitute *withdrawal* of a small business set-aside.  Instead, the government contends that FAR 19.502-9 "applies solely when an agency decides to withdraw a set-aside in order to open the competition to, or make award to, a business that does not qualify for the existing set-aside."  ECF No. 89 at 9.  Therefore, the government argues that, at best, StraCon's claim is unripe because the agency has not yet elected to resolicit the procurement to other-than-small businesses.  ECF No. 77 at 32–33.  In contrast, StraCon asserts that withdrawal encompasses cancellation, as the ordinary definition of withdraw is "'[t]o take back,' '[t]o retract,' or '[t]o refrain from prosecuting or proceeding with (an action).'"  ECF No. 80 at 13 (alterations in original) (quoting *Withdraw*, BLACK'S LAW DICTIONARY (12th ed. 2024)).  And similarly, a "cancellation of a solicitation also takes back, retracts, or refrains from proceeding with the solicitation."  *Id.*  Under StraCon's interpretation, the cancellation of a set-aside is synonymous with, or constitutes a type of, withdrawal.  The government disagrees and instead views "withdrawal from a small business set-aside [as] a distinct activity from cancelling a solicitation."  ECF No. 89 at 10.  And because "there is no record evidence of intent to withdraw from the set-aside and award the same work to

an other-than-small business," the government insists that it did not violate this FAR provision. *Id*. at 9. Furthermore, the government points to the source selection authority's statement in the cancellation memorandum that "'FAR 19 small business programs' should be given 'due regard' in 'any future acquisition strategy,' as a clear message of agency intent to keep the set-aside." *Id*. at 9–10 (quoting Tab 18 at AR 1239).

FAR 19.502-9(a) permits an agency to "withdraw [a] small business set-aside" if "the contracting officer considers that award [of the contract] would be detrimental to the public interest." 48 C.F.R. 19.502-9(a); *see also Tolliver Grp., Inc. v. United States*, 151 Fed. Cl. 70, 118 (2020) (holding that FAR 19.502-9 "permits a contracting officer to 'withdraw [a] small business set-aside *only where* 'before award of a contract involving a total or partial small business set-aside, the contracting officer considers that award would be detrimental to the public interest.'" (alteration in original) (emphasis added) (quoting 48 C.F.R. 19.502-9(a)). While FAR 19.502-9(a) permits withdrawal of a set-aside, it also mandates that when an agency withdraws a small business set-aside, it must give notice to the proper officials. Moreover, if the agency's small business specialist does not agree with the agency's withdrawal decision, then FAR 19.502-9(b) dictates that "the case shall be promptly referred to the SBA PCR . . . for review." Here, the government concedes that the agency did not observe these procedural requirements. *See* ECF No. 77 at 32. Accordingly, the question before the Court is whether the requirements of FAR 19.502-9 apply in an instance such as here where the agency cancelled the solicitation rather than amending the solicitation to withdraw the small business set-aside. The Court easily answers that question in the affirmative.

The cancellation of a solicitation is encompassed within the plan meaning of the term "withdrawal" as used in FAR 19.502-9. Withdrawal is not defined in FAR part 19. Accordingly, "to ascertain the 'established meaning,' of a term . . . it is appropriate to consult dictionaries." *Pesquera Mares Australes Ltda. v. United States*, 266 F.3d 1372, 1382 (Fed. Cir. 2001) (citations omitted) (quoting *NSK Ltd. v. United States*, 115 F.3d 965, 974 (Fed. Cir. 1997)). Dictionaries give slightly different definitions of "withdraw." *See e.g.*, *Withdraw*, BLACK'S LAW DICTIONARY (12th ed. 2024) ("To take back . . . . To retract . . . . To refrain from prosecuting or proceeding with (an action) . . . ."); *Withdraw*, OXFORD ENGLISH DICTIONARY (2nd ed. 1989) ("To take back or away (something that has been given, granted, allowed, possessed, enjoyed, or experienced)."); *Withdraw*, AMERICAN HERITAGE DICTIONARY (5th ed. 2022) ("To take back or away; remove . . . ."). Broadly, "withdraw" contemplates an act in which something is taken back or removed. Notably, none of these definitions carry the government's constrained interpretation of withdrawal as an act that requires both withdrawal *and* another affirmative step—in this case, awarding the work to an other-than-small business— to complete the act. *See* ECF No. 89 at 9. Rather, definitionally, the removal or taking away of something completes the act of withdrawal. In this context, StraCon's definition of "withdraw," as an act that "takes back, retracts, or refrains from proceeding with the solicitation," ECF No. 80 at 13, is consistent with the plain meaning of the word. Similarly, cancellation contemplates an act that involves annulling or invalidating a previous act. *Cancel*, AMERICAN HERITAGE DICTIONARY (5th ed. 2022) ("To annul or invalidate . . . ."). While the two terms are not necessarily synonymous, they nonetheless contemplate an act that revokes or sets aside a previous act. Therefore, in the context of FAR 19.502-9, a cancellation of a small business set-aside is at least a type or method of withdrawal of a set-aside. Functionally, when a set-aside is

cancelled, it ceases to exist.  And when a set-aside is withdrawn, it too ceases to exist.  The terms are coextensive.  Thus, when the agency cancelled the solicitation, it was required to observe the requirements of FAR 19.502-9 because the set-aside was withdrawn.

Any doubts as to whether cancellation constitutes withdrawal are put to rest when comparing FAR 19.502-9 with FAR 19.502-2(a).  Under FAR 19.502-2(a), "[i]f the contracting officer receives no acceptable offers from responsible small business concerns, the set-aside shall be withdrawn and the requirement, if still valid, shall be *resolicited* on an unrestricted basis."  48 C.F.R. § 19.502-2(a) (emphasis added).  But if the government's theory is correct, why would any resolicitation be necessary?  Under the government's interpretation, after withdrawal there would still be a live solicitation that was unrestricted to small businesses.  According to the government, withdrawal and cancellation are two distinct things.  However, that is not how FAR 19.502-2(a) contemplates the state of affairs after withdrawal.  Under FAR 19.502-2(a) the withdrawal of the small business set-aside encompasses cancellation of the solicitation.  Otherwise, *resolicitation* would be unnecessary.  It is a basic legal tenet that "[t]he rules of statutory construction apply when interpreting an agency regulation."  *Roberto v. Dept' of the Navy*, 440 F.3d 1341, 1350 (Fed. Cir. 2006).  And when interpreting a statute, one of the most basic interpretive canons is that "[a] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant . . . ."  *Hibbs v. Winn*, 542 U.S. 88, 101 (2004) (quoting 2A N. SINGER, STATUTES AND STATUTORY CONSTRUCTION § 46.06 at 181–86 (rev. 6th ed. 2000)).  But the government's interpretation of withdrawal would render the latter half of FAR 19.502-2(a)—"shall be resolicited on an unrestricted basis"—"inoperative or superfluous, void or insignificant" because, under the government's interpretation, no resolicitation would be necessary as withdrawal of a small business set-aside does not involve cancellation of a solicitation.  In sum, StraCon's interpretation of withdrawal gives effect to every part of FAR 19.502-2(a), while the government's interpretation reads out the later portion of the provision.  *See United States v. Menasche*, 348 U.S. 528, 538–39 (1955) ("It is our duty 'to give effect, if possible, to every clause and word of a statute,' rather than to emasculate an entire section, as the Government's interpretation requires." (citation omitted) (quoting *Inhabitants of Montclair Tp. v. Ramsdell*, 107 U.S. 147, 152 (1883))).

The government's interpretation of the provision runs into further interpretative problems within the FAR.  As discussed above, the government contends that it could essentially withdraw the small business set-aside and continue with the procurement, and thus withdrawal and cancellation are unrelated.  However, FAR 15.206(e)—the FAR's so-called cardinal change provision—makes clear that withdrawal of a set-aside, as the government defines it, always entails cancellation of the solicitation.  Thus, as a practical matter, the government's strained interpretation of withdrawal does not comport with the FAR.  FAR 15.206(e) provides:

> If, in the judgment of the contracting officer, based on market research or otherwise, an amendment proposed for issuance after offers have been received is so substantial as to exceed what prospective offerors reasonably could have anticipated, so that additional sources likely would have submitted offers had the substance of the amendment been known to them, *the contracting officer shall*

*cancel the original solicitation and issue a new one*, regardless of the stage of the acquisition.

48 C.F.R. § 15.206(e) (emphasis added). In short, under FAR 15.206(e), a contracting officer must cancel a solicitation when an amendment is so substantial that it exceeds what prospective offerors reasonably could have anticipated. What else would withdrawing a small business set-aside be than so substantial as to exceed what prospective offerors reasonably could have anticipated? By definition, a small business set-aside excludes any business that does not qualify for the set-aside from the procurement. Thus, withdrawal of a set-aside must constitute an amendment that substantially exceeds expectations because capable non–small businesses would then be able to compete for award of a contract, the competition from which they were previously excluded. Therefore, when a solicitation is amended so that a set-aside is removed and is solicited as open to other competitors that did not originally qualify for that set-aside, "additional sources likely would have submitted offers had the substance of the amendment been known to them," triggering FAR 15.206(e) and requiring the contracting officer to "cancel the original solicitation and issue a new one." 48 C.F.R. § 15.206(e). Effectively, FAR 15.206(e) mandates the cancellation of a solicitation whenever a small business set-aside is withdrawn and further demonstrates why the government's interpretation of the term withdrawal is untenable. *See Champagne v. United States*, 35 Fed. Cl. 198, 210 (1996) ("[W]hen reviewing the statute at issue in this case, this court must construe each part of a statute in connection with all the other sections, so as to produce a harmonious whole.").

Finally, the government's contention that the agency's FAR 19 obligations are satisfied by the source selection authority's statement in his cancellation memorandum—that "'FAR 19 small business programs' should be given 'due regard' in 'any future acquisition strategy'"— does not help its case. ECF No. 89 at 9–10 (quoting Tab 18 at AR 1239). The agency's failure to observe procedures mandated by the FAR cannot be cured by the recitation of a truism. The agency is legally required to give "due regard" to small businesses in its acquisition strategy. *See* FAR 19.201(a) ("It is the policy of the Government to provide maximum practicable opportunities in its acquisitions to small business . . . . Such concerns must also have the maximum practicable opportunity to participate as subcontractors in contracts awarded by any executive agency . . . ."). Restating that legal obligation is not the equivalent of preserving the small business set-aside that the agency was only permitted to withdraw if certain pre-conditions were met.

In the government's words, "the Court construes the regulation in light of the regulatory scheme." ECF No. 89 at 9 (citing *SH Synergy, LLC v. United States*, 165 Fed. Cl. 745, 767 (2023) ("[T]his Court may not construe Section 125.8(e) in isolation and must instead interpret the provision as part of a symmetrical and coherent regulatory scheme fitting, if possible, all parts into a harmonious whole.")). But unfortunately for the government, its interpretation of FAR 19.502-9, conflicts with other provisions of, and undermines the regulatory scheme instituted by the FAR. On the other hand, interpreting *cancellation* as a type of *withdrawal* is consistent with the plain meaning of the word, aligns with other FAR provisions, and comports with the procedural protections built into the FAR for small businesses concerns. Consequently, the Court finds that the agency violated one of its obligations to small businesses under the FAR in cancelling the solicitation without following the procedures required by FAR 19.502-9.

Moreover, StraCon has demonstrated that Plaintiffs were prejudiced by the agency's failure to adhere to FAR 19.502-9. Plaintiffs were offerors in the competitive range for SETA III and had a substantial chance of award had the solicitation not been cancelled. *See Shinseki v. Sanders*, 556 U.S. 396, 410 (2009) ("Often the circumstances of the case will make clear [that the error] . . . was harmful and nothing further need to be said."); *see also* ECF No. 1 ¶ 90; Complaint ¶ 247, *StraCon*, No. 24-cv-1418, (Fed. Cl. Sept. 10, 2023), ECF No. 1; Complaint ¶ 4, *Tech. & Project Eng'g*, No. 24-cv-1575 (Fed. Cl. Oct. 4, 2024), ECF No. 1. Having established both error and prejudice, Plaintiffs prevail on this ground in their protest of the agency's cancellation decision. *See Bannum,* 404 F.3d at 1351.

## 2. The Agency's Stated Decision for Cancelling the Solicitation Lacks a Rational Basis.

Next, Plaintiffs assert that the agency's cancellation decision lacks a rational basis. *See* ECF No. 72-1 at 22–28; ECF No. 73-1 at 24–28; ECF No. 74-1 at 25–31. Plaintiffs allege that the cancellation decision is irrational because the agency did not adequately address the original D&F's conclusion that "only a single-source can reasonably perform the work" encompassed in the SETA III solicitation. Tab 18 at AR 1248; *see* ECF No. 73-1 at 27; ECF No. 74-1 at 26. In response, the government asserts that "[a] cancellation decision must be sustained where the agency provides a coherent and reasonable explanation of its exercise of discretion, articulating a rational connection between the facts found and the choice made." ECF No. 77 at 17. The government argues that the cancellation decision was rational because the source selection authority "determined that the single-source approach contemplated by the solicitation—a departure from the usual preference for multiple awards—is not needed, because the same services have been, and may continue to be, provided by multiple vendors through multiple contracts," ECF No. 89 at 13, and that "the only thing [the agency] need[s] under the APA standards is a reasonable explanation" for its decision, ECF No. 94 at 124:22–23. The government further contends that the source selection authority "believed that multiple-award contracts are in the public interest, and that the use of multiple contractors had been 'helpful to the mission,'" providing a "rational basis to reject the single-contractor approach." ECF No. 77 at 26 (citation omitted) (quoting Tab 18 at AR 1237). However, StraCon counters that the source selection authority "declared the reasoning for the original single award acquisition unsupported and thus decided to cancel the Solicitation," and the government's arguments ignore the agency's stated rationale for the cancellation decision. ECF No. 80 at 17. Moreover, Mayvin observes that the agency narrowly examined only "whether the single-award IDIQ approach was consistent with current practices across the PEO," and not whether other acquisition strategies were justified. ECF No. 79 at 11 (citing Tab 17 at AR 1146). Separately, StraCon argues that the agency's decision was pretextual and made to avoid litigation, ECF No. 74-1 at 31–34, while Mayvin argues that the agency's actions violated its obligation to conduct a fair procurement, ECF No. 73-1 at 36–38.

For an agency's cancellation decision "to be found not to be arbitrary and capricious, the agency must have 'examine[d] the relevant data and articulate[d] a satisfactory explanation'; this explanation must be 'coherent and reasonable'; and it must not 'entirely fail[] to consider an important aspect of the problem' or 'run[] counter to the evidence before the agency.'" *MORI Assocs., Inc. v. United States*, 102 Fed. Cl. 503, 544 (2011) (alterations in original) (citations

omitted) (first quoting *State Farm*, 463 U.S. at 43; then quoting *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1333 (Fed. Cir. 2001); and then quoting *Ala. Aircraft Indus*, 586 F.3d at 1375). When reviewing an agency's action, the Court "may uphold agency action only on the grounds that the agency invoked when it took the action." *Michigan v. Env't Prot. Agency*, 576 U.S. 743, 758 (2015). In other words, "[a]n agency must defend its actions based on the reasons it gave when it acted." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 24 (2020).

Here, the agency's given reason for cancelling the solicitation was that "[t]he need for a single award IDIQ contract is no longer supportable by the facts." Tab 18 at AR 1240. Specifically, the agency found that existence of seven SETA-type contracts was "not in line with the argument as stated in the D&F that PEO STRI requires a single SETA contractor to provide a comprehensive solution for the PEO STRI in its entirety." *Id* at AR 1237. According to the contracting officer, "the methodology [in the D&F] used to justify the single source award for the SETA contract was undermined with the award of the additional contracting efforts for SETA-type support." Tab 19 at AR 1253. The contracting officer further stated that, "not only does the existence of multiple SETA-type support contractors undermine the argument that PEO STRI requires a single contractor to provide a comprehensive solution for each task order, but it also undermines the statutory criteria that the task 'orders expected under the contract are so integrally related that only a single-source can reasonably perform the work.'" *Id*. (quoting 10 U.S.C. § 3403(d)(3)(A)(i); 48 C.F.R. § 16.504(c)(1)(ii)(D)(1)(i)). Thus, the agency determined that because of the existence of multiple SETA-type contracts, the SETA III requirements were not "so integrally related that only a single source can reasonably perform the work," and, therefore, the statutory preference for multiple-source awards applies, and the SETA III solicitation must be cancelled. Tab 18 at AR 1239 (quoting 10 U.S.C. § 3403(d)(3)(A)(i); 48 C.F.R. § 16.504(c)(1)(ii)(D)(1)(i)). These conclusions were based on an updated market research report ordered by the contracting officer, which included a table of statements made in the D&F memorandum that were purportedly refuted by the existence of seven SETA-type contracts. *See* Tab 17 at 1148–1149.

By justifying its decision on the ground that the existence of seven SETA-type contracts undermined the assertions made in the 2021 D&F, the agency assigned itself the task of refuting the underlying rationale of that memorandum. To be clear, the agency did not need to go down this road—it may have been able to find other lawful reasons to cancel the solicitation. However, the agency must stand by the reasons it gave for cancelling the solicitation when it cancelled the solicitation. Accordingly, the Court assesses the rationality of the agency's decision based on whether the reasoning in the D&F was in fact undermined by the findings in the updated market research report.

At the outset, the Court notes the agency has not asserted that its needs have changed. Rather, the agency justifies its decision on the basis that the conclusions and underlying assertions in the D&F memorandum were flawed. Tab 18 at AR 1239. However, the government broadly asserts that the agency "just need[ed] to have *any* reason to have a different strategy" to justify moving from a single award acquisition strategy to a multiple award acquisition strategy. ECF No. 94 at 126:13–14 (emphasis added). The government argues that the agency rationally decided to cancel the SETA III procurement because of the benefits of

multiple-award contracts and "the absence of a centralized structure to enforce the restrictions of the single-source IDIQ strategy." *Id*. at 137:18–20; *see also id*. at 134:14–17, 140:15–18. However, the administrative record does not bear this out. The agency explicitly stated that its reason for the cancellation was that "the actual practices at PEO STRI are no longer consistent with the facts as described in the single-source IDIQ D&F." Tab 18 at AR 1239. The agency neither evaluated the benefits gained by a multiple award approach over a single award approach nor discussed how "the absence of a centralized structure to enforce the restrictions of the single-source IDIQ strategy" undermined the D&F to the extent that the solicitation should be cancelled.[3] The government's post hoc characterization of the agency's reason for the cancellation is irrelevant in assessing the rationality of the agency's actions. Although the government is correct that "[u]nder the APA standards, the Court does not substitute its judgment for the agency," ECF No. 77 at 24, similarly, the Court also does not substitute a rationale raised by the Department of Justice in litigation for the rationale the agency gave at the time it made the decision that is being protested. Simply put, the government does not get to substitute new reasoning in litigation for the agency's reasoning. Here, the agency decided to cancel the solicitation because it found underlying assumptions made in the 2021 D&F to be undermined by the presence of seven SETA-type contracts across the PEO STRI. Tab 18 at AR 1237. Accordingly, the rationality of the agency's cancellation decision is adjudicated based on that reason.

Turning to the 2021 D&F and the agency's cancellation decision, contrary to the agency's explanation in its updated market research report, the facts did not change between the 2021 D&F and 2024 updated market research report. In fact, most of the SETA III-type contracts referenced in the updated market research report existed prior to the issuance of the D&F in March 2021.[4] Accordingly, the 2021 D&F was issued with knowledge that PEO STRI had procured SETA-type services outside of the SETA I and SETA II contracts. The Court must presume that the agency was aware of this on contracts when it wrote the 2021 D&F. Indeed, that D&F was authored by the Head of Contracting Activity for PEO STRI. *See* Tab 18 at AR 1248. Moreover, the government has not offered any evidence that the agency was not aware that it had procured services through these seven smaller SETA-type contracts. In fact, if the agency was unaware of the existence of these contracts, this would actually support the reasoning outlined in the 2021 D&F that an MA ID/IQ approach "would not allow PEO STRI to effectively and efficiently fulfill its role as the critical lead in ensuring all training and testing solutions are appropriately integrated and synchronized across the Army," Tab 18 at AR 1237, 1244, and that "the absence of controls in the overall process resulted in approval of service contract actions without full consideration of the impact on the organization's acquisition

---

[3] The closest the agency comes to discussing the benefits of a multiple award approach is a broad conclusory statement that "[t]he public interest is best served when multiple award contracts are used." Tab 18 at AR 1239. However, the agency's recitation of Congress's intent behind 10 U.S.C. § 3403 and 48 C.F.R. § 16.504(c) does not explain how this preference applies here. Moreover, the D&F explains how it is in the public interest to procure the SETA III requirement as a single-source IDIQ contract. *See generally* Tab 18 AR 1241–47.

[4] The HCA issued the D&F on March 11, 2021. Tab 18 at AR 1248. At least four of the SETA-type contracts identified in the administrative record predate the issuance of the D&F. *See* Tab 2f at AR 313; Tab 13 at AR 991; Tab 15 at AR 1077; Tab 16 at AR 1095.

strategy as a whole," *id.* at AR 1237.  The D&F acknowledged the possibility of these types of issues arising under an MA ID/IQ contract.  *See id.* at AR 1244–45 ("Attempting to divide PEO STRI's task orders across more than one contract will marginalize PEO STRI's ability to establish an integrated and interoperable COE.");  *see also id.* at AR 1247 ("A single-source ID/IQ contract would . . . prevent the fragmentation of cooperation among the contractors and the workforce that would be inevitable with a MA ID/IQ contract environment.").  Accordingly, the existence of these seven contracts (most of which existed prior to the D&F) seems to support rather than undercut the rationale of the 2021 D&F.  Thus, it was not rational for the agency to use the existence of the very problem identified as part of the rationale for the 2021 D&F's justification for a single-award approach to argue in 2024 that the 2021 D&F overlooked that same problem.  The agency's reasoning is circular in this respect.

Crucially, an examination of the agency's stated reasons for cancelling the solicitation demonstrates that the agency "entirely failed to consider an important aspect of the problem." *State Farm*, 463 U.S. at 43.  The agency does not explain how the existence of the SETA-type contracts it identifies is relevant to the analysis conducted in 2021 D&F.  These seven contracts only constitute a fraction of the task orders and $365 million total value contemplated by the SETA III procurement.  Not all of these contracts were included in the administrative record but, for example, the agency cites to the award of a $9,208,406 contract to Netizen for cybersecurity engineering and information assurance support services as evidence that the D&F is flawed in its assumptions, Tab 18 at AR 1235; *see* Tab 13 at AR 992, 996, and a $3,048,421.63 contract to IBM to perform audit readiness preparations in support of the Department of Defense, Tab 18 at AR 1236; Tab 14 at AR 1024.  These contracts are obviously much smaller than the up to $365 million award contemplated by the SETA III solicitation.

With little explanation, the agency asserts that the very existence of these smaller contracts undermines the detailed findings in the 2021 D&F.  *See* Tab 18 at AR 1235–36. However, the D&F did not focus on the administration of each constituent SETA task order in a vacuum.  Rather, the D&F analyzed the totality of the SETA III requirement, and it concluded that the procurement, *in the aggregate*, had to be managed by a single source.  *See, e.g.*, *id.* at AR 1244 ("In order to continue successfully implementing integration and interoperability across the COE, PEO STRI requires a single SETA contractor to provide not only a comprehensive solution for each task order but for PEO in its entirety.").  The agency's decisional documents do not refute this conclusion.  The agency cannot meaningfully compare discretely sourced, specific contracts with the totality of the $365 million SETA III requirement and the complexity of managing all the task orders contained in SETA III across PEO STRI with the existence of seven smaller contracts.  As StraCon notes, "[n]either the SSA nor the Market Research explain why the mere observation that parts of the organization may use another SETA contractor for a specific service negates single award justification.  They just declare it so."  ECF No. 74-1 at 28. The closest the agency comes to explaining its departure from the D&F is its claim that "[c]ontrary to the language of the D&F, the manpower resources exist to procure and manage multiple service contractors.  The results of the market research seem to suggest that meeting service contract needs either at the program office level or through multiple functionality-based contracts is more feasible than originally described in the D&F."  Tab 18 at AR 1234.  But even this tentative conclusory statement is flawed in its premise.  The D&F concluded that SETA requirements, *as a whole*, were integrally related such that "[o]ne prime contractor managing all

PEO STRI Task Orders provides the most efficient means to satisfy the SETA requirements across the organization." *Id*. at AR 1244. The agency assumes, without support in the administrative record, that the fact that parts of the agency have sourced smaller, separate SETA-type contracts means that the agency can source the entirety of the SETA III procurement through a multiple award contract vehicle without encountering the issues identified by the 2021 D&F. The agency does not address how the benefits gained by a single prime contractor are undermined by the existence of seven other smaller SETA-type contracts, which the HCA presumably knew of when issuing the D&F. *See id*. at AR 1247 ("A single-source ID/IQ contract would allow for a requirement to be put on contract within days/weeks instead of months, it would allow for a more cohesive and responsive contracting solution, reduce program management, and prevent the fragmentation of cooperation among the contractors and the workforce that would be inevitable with a MA ID/IQ contract environment."). Additionally, the D&F reasoned that a multiple award approach "would impede PEO STRI's mission to be the U.S. Army's acquisition Center of Excellence (COE) for training and testing solutions." *Id.* at AR 1244. Nowhere does the agency address this contention or assert that this mission has changed.

What is more, it is not clear from the record that the seven SETA-type contracts identified by the agency were, in fact, SETA contracts. As the agency itself observed, "some of the contracts identified in [the] search *did not meet the reviewer's definition of SETA services*." Tab 17 at AR 1146 (emphasis added). In other words, not all seven contracts are SETA contracts. Instead, the agency simply decided the seven contracts were "*deemed similar* to the services to be provided by the single source SETA enterprise contract." *Id.* at AR 1146–47 (emphasis added). Deeming the contracts similar with no explanation as to why they are similar may be good enough for government work, but it is not good enough to meet the requirements of the APA standard. Rather, it is the definition of arbitrary and capricious.

The agency fails to rationally accomplish the task it assigned itself: refute the reasoning of the 2021 D&F. The 2021 D&F analyzed the issue of whether "the task or delivery orders are so integrally related that only a single-source can reasonably perform the work." Tab 18 at AR 1241 (citing FAR 16.504(c)(1)(ii)(D)(1)(i)). The D&F determined that they were for a multitude of reasons. Recall, the D&F memorandum concluded, *inter alia*, that "awarding multiple contracts for severable, distinct efforts for continuing SETA requirements would not allow PEO STRI to effectively and efficiently fulfill its role as the critical lead in ensuring all training and testing solutions are appropriately integrated and synchronized across the Army." *Id*. at AR 1244. Furthermore, splitting efforts across multiple contractors would cost more, require more manpower to manage, undermine PEO STRI's efforts to establish an integrated and interoperable COE, impede uninterrupted support services, and introduce mission, schedule, and cost risks. *See id*. at AR 1244–47. In cancelling the SETA III procurement, the agency states that these assertions from the 2021 D&F are undermined by the fact that seven SETA-type contracts exist. *Id*. at AR 1236–38. The government suggests that the agency concluded that the benefits of a multiple contract strategy outweigh the original rationale for the single award approach. *See* ECF No. 94 at 140:15–18. But the reasoning for this conclusion is both thin and unsupported by the administrative record. Indeed, according to the record, the genesis for the cancellation decision was the contracting officer's inquiry as to whether the underlying assumptions in the D&F were *consistent with current practices*, not an evaluation of whether the SETA III tasks are

so integrally related that a single-award IDIQ approach is appropriate.  Tab 18 at AR 1232.  The agency fails to bridge the crucial inferential gap to explain that any inconsistency between current practices and assumptions made in the D&F necessarily means that SETA III must be sourced as a multiple-award contract.  In short, the agency's apples-to-oranges comparison of seven discrete, SETA-type contracts to the entirety of the SETA III procurement does not give it rational grounds to refute the 2021 D&F's determination that the "task or delivery orders are so integrally related that only a single-source can reasonably perform the work."  *Id*. at AR 1241.

Ultimately, the agency fails to demonstrate rationally why the conclusions of the 2021 D&F should be disregarded.  In a memorandum directing the cancellation of the SETA III solicitation, the source selection authority points to a list of statements from the 2021 D&F that are purportedly "not supportable in light of the facts as we know them today."  *Id.* at AR 1237; *see* 1237–38.  But the source selection authority does not explain how these statements are unsupported by the facts.  *See Judulang v. Holder*, 565 U.S. 42, 45 (2011) ("When an administrative agency sets policy, it must provide a reasoned explanation for its action.  That is not a high bar, but it is an unwavering one.").  Instead, he simply lists the allegedly unsupportable statements.

For example, the source selection authority points to the D&F's assertion that "[a]ttempting to divide PEO STRI's task orders across more than one contract will marginalize PEO STRI's ability to establish an integrated and interoperable COE" as an example of a statement "not supportable in light of the facts as [the agency] know[s] them today."  Tab 18 at AR 1237.  But the source selection authority does not provide any explanation as to how this statement is refuted by the existence of the smaller SETA-type contracts.  In fact, the presence of these contracts outside of the SETA procurements is likely more symptomatic of the issues diagnosed by the D&F that the SETA III solicitation seeks to mitigate rather than a fatal flaw in the D&F's underlying assumptions.  *See id*. at AR 1246–47.  Similarly, the agency declares that the D&F's conclusion that failure to adhere to a single award approach would negatively impact cost, schedule, and performance of SETA III is refuted by the facts.  *Id*. at AR 1238.  Whereas the D&F points to concrete examples for its conclusion, such as "the oversight costs associated with managing and overseeing multiple contracts," the source selection authority entirely fails to explain how cost, schedule, and performance would be impacted by either a multiple award strategy or SETA's III single award strategy.  *Id*. at AR 1247.  The source selection authority also points to a statement in the D&F that posits that "[a] MA IDIQ contract would require more manpower resources currently dedicated to procure and manage multiple contractors."  *Id.* at AR 1237.  The D&F supports this conclusion by pointing to "cost efficiencies across task orders" (realized through a single-source IDIQ), the ability of contractors to "shift[] their resources from one program to another to ensure mission success," and concerns with the need for "extensive Government program management personnel and resources to support numerous, sometimes simultaneous, source selections over sustained periods of time" in a MA IDIQ contract.  *Id.* at AR 1244, 1247.  Again, the source selection authority merely declares that this reasoned conclusion is rebutted without any explanation.  *See id*. at 1237.  Simply put, the source selection authority does not explain *how* the existence of seven SETA-type contracts refutes any of the D&F's statements listed in the updated market research report and the cancellation memorandum.

The D&F supports its conclusion that SETA III, like SETA I and II, must be procured as a single award IDIQ with an analysis of past procurement history and market research. *Id.* at AR 1243. In contrast, each purportedly rebutted statement of the D&F from the updated market research report and the source selection authority's cancellation memorandum is devoid of *any* reasoning whatsoever. The agency's assertion that the conclusions of the 2021 D&F are unsupported is itself unsupported. But an agency must explain its rationale for the choices made for the Court to uphold the agency's decision-making under the APA standard. *See State Farm*, 463 U.S. at 43 ("We may not supply a reasoned basis for the agency's action that the agency itself has not given."). Bereft of a reasoned explanation, the agency's decision to overrule the 2021 D&F and thereby cancel the solicitation cannot stand.

For the reasons discussed above, the Court finds that the agency's cancellation decision was irrational. The agency's cancellation decision lacked a rational basis because its given reasons (to the extent they were actually given) "entirely fail[] to consider an important aspect of the problem" and "run[] counter to the evidence before the agency." *State Farm*, 463 U.S. at 43. The government's belated explanation that the public benefits of a multiple award contract outweighed the benefits identified in the 2021 D&F or that the agency could not enforce single award strategy are unavailing. *See* ECF No. 94 at 134:14–17; 137:18–21. In short, the agency flunked its own assignment: refute the 2021 D&F. Furthermore, Plaintiffs were prejudiced by the agency's irrational cancellation decision. Plaintiffs were offerors for the solicitation at issue and had a substantial chance of being awarded the contract had the solicitation not been cancelled. *See Shinseki*, 556 U.S. at 410; *see also* ECF No. 1 ¶ 90. Thus, Plaintiffs have demonstrated prejudicial error and succeed on this ground in their protest. The Court has considered the other arguments raised by Mayvin[5] and StraCon[6] related to this protest ground and finds them unconvincing.

---

[5] The Court need not address Mayvin's argument that the agency's actions violate the FAR's requirement to conduct a fair procurement. ECF No. 73-1 at 36–38. Mayvin argues that the agency's decision violated this requirement because "[t]he [agency's] justifications for cancelling the procurement are not credible and are not supported by the record." *Id.* at 37. In other words, Mayvin argues that the agency's actions were not fair because they were irrational. Thus, this fairness argument is entirely subsumed by the Court's analysis of whether the cancellation decision was rational.

[6] StraCon additionally argues that the agency's cancellation decision was pretextual. StraCon alleges that the agency "cancelled the procurement to end the litigation." ECF No. 74-1 at 34. As evidence of pretext, StraCon points to "the timing of the cancellation decision and lack of any reasoned explanation for the belated change in procurement approach . . . ." *Id.* StraCon asserts that the only explanation for the timeline of events leading up to the agency's decision is that the agency cancelled the procurement to end the litigation. In response to StraCon, the government notes that "difficulty pinpointing the genesis of a decision is not uncommon," and that "[w]hen the [agency] first began thinking about this issue is completely irrelevant." ECF No. 77 at 43, 42. The government is correct. StraCon's argument that the agency's decision was pretextual amounts to an accusation that the government acted in bad faith in cancelling the solicitation. *See BAE Sys. Norfolk Ship Repair, Inc. v. United States*, 163 Fed. Cl. 217, 238 (2022) ("The Court agrees with Judge Block and finds that Plaintiff's pretext argument is no

### 3. Plaintiffs Fail to Demonstrate that the Agency's Decision to Cancel the Solicitation Violates 10 U.S.C. § 3301(b).

Finally, Plaintiffs assert that the Army's decision to cancel the solicitation was contrary to law because, pursuant to 10 U.S.C. § 3301, a solicitation related to an Armed Forces procurement may only be canceled by the "head of the agency" and only if doing so is in the "public interest." Specifically, 10 U.S.C. § 3301(b) provides that "[a]ll . . . competitive proposals received in response to a solicitation may be rejected if the head of the agency determines that such action is in the public interest." *See also* 41 U.S.C. § 3701(b) ("All . . . competitive proposals received in response to a solicitation may be rejected if the agency head determines that rejection is in the public interest."). According to Plaintiffs, the solicitation at issue was not canceled by the head of the agency and the administrative record does not indicate that the justification for the cancellation was in the public interest. *See* ECF No. 72-1 at 27–28; ECF No. 73-1 at 21–24; ECF No. 74-1 at 18–21. Plaintiffs' argument is one that judges of this Court, including the undersigned, have touched upon in the past but have not directly had to address, at least not in a FAR part 15 procurement. *See, e.g.*, *BAE Sys. Norfolk Ship Repair, Inc.*, 163 Fed. Cl. at 228 (discussing the applicability of 10 U.S.C. § 3301(b) in dicta); *Seventh Dimension, LLC v. United States*, 160 Fed. Cl. 1, 17 (2022) (avoiding the ultimate question regarding the applicability of 10 U.S.C. § 3301 because the agency improperly cancelled the procurement under FAR 15.206(e)); *Tolliver Grp.*, 151 Fed. Cl. at 119 (finding a violation of 10 U.S.C. § 3301(b)[7] in a FAR part 8 procurement where there was no evidence of a delegation to the contracting officer under the applicable regulations governing FAR part 8 procurements). Plaintiffs' argument presents two issues: 1) whether the solicitation was cancelled by the head of the agency; and 2) whether the cancellation decision was based on the public interest. The Court will address each issue in turn.

---

different than a claim that the government acted in bad faith, and Plaintiff must meet the high standard of clear and convincing evidence."). However, "government officials are presumed to carry out their duties in good faith." *Spezzaferro v. Fed. Aviation Admin.*, 807 F.2d 169, 173 (Fed. Cir. 1986). To overcome this presumption, StraCon must point to "clear and convincing evidence to the contrary." *Rd. & Highway Builders, LLC v. United States*, 702 F.3d 1365, 1369 (Fed. Cir. 2012). StraCon, though, only offers circumstantial evidence that the timing of the agency's decision may be suspect. *See* ECF No. 74-1 at 33–34. This is far short of the required "'well-nigh irrefragable proof' to overcome the presumption." *Sanders v. U.S. Postal Serv.*, 801 F.2d 1328, 1331 (Fed. Cir. 1986) (quoting *Fucik v. United States*, 228 Ct. Cl. 379, 391 (1981)). Moreover, to the extent that StraCon's pretext argument is contingent on the "lack of any reasoned explanation for the belated change in procurement approach," ECF No. 74-1 at 34, this prong of the argument is already addressed above in the Court's analysis of the rationality of the agency's cancellation decision.

[7] The provision was codified at 10 U.S.C. § 2305(b)(2) at the time that *Tolliver Group, Inc. v. United States*, 151 Fed. Cl. 70 (2020), was decided.

### a. Head of the agency

Section 3301(b) clearly provides that the cancellation of a solicitation (i.e., rejecting all proposals received in response to a solicitation)[8] can only happen upon the determination by the head of the agency that cancellation is in the public interest. 10 U.S.C. § 3301(b). Accordingly, at first glance it would appear that a solicitation cannot be cancelled by the source selection authority, as was done here, because 10 U.S.C. § 3004 provides that "the term 'head of an agency' means the Secretary of Defense, the Secretary of the Army, the Secretary of the Navy, the Secretary of the Air Force, the Secretary of Homeland Security, and the Administrator of the National Aeronautics and Space Administration [("NASA")]." However, as the government points out in response to Plaintiffs' argument, 10 U.S.C. § 3065 provides that "the head of an agency may delegate, subject to his direction, to any other officer or official of that agency, any power under any provision of this part that is a chapter 137 legacy provision" and that section 3301 is a "chapter 137 legacy provision." *See* 10 U.S.C. § 3016 (defining the term "chapter 137 legacy provision" to include 10 U.S.C. § 3301); ECF No.77 at 20–21. Therefore, read together, these provisions provide that the authority to cancel a solicitation may be delegated from the Secretary of the Army to the source selection authority.

The question then obviously turns on whether the head of the agency delegated his cancellation authority to the source selection authority. According to the government, the answer to this question is a resounding "yes," as FAR 15.305 provides that "[t]he *source selection authority* may reject all proposals received in response to a solicitation, if doing so is in the best interest of the Government." 48 C.F.R. § 15.305(b) (emphasis added); ECF No. 77 at 22–23. The government reasons that because the Secretary of the Army is subject to the control of the Secretary of Defense, and the Secretary of Defense, in conjunction with the General Services Administrator and the NASA Administrator, have the statutory authority to issue and maintain the FAR, the Secretary of Defense delegated his authority for Department of Defense procurements to the source selection authority when the FAR Council promulgated FAR 15.305(b) in 1997. ECF No. 77 at 22–23. In response, Plaintiffs essentially contend that because the FAR is promulgated by three agency heads (the FAR Council) and the rewrite of FAR part 15 was tasked to an ad-hoc committee, the government cannot show that the Secretary of Defense participated in the promulgation of FAR 15.305(b) and thereby delegated the Secretary of the Army's cancellation authority to the source selection authority. *See, e.g.*, ECF No. 80 at 8–9; ECF No. 79 at 5 ("The Government does not reference any other regulation, directive, or other document as the basis for delegation of this authority, nor is there any such documentation in the agency record.").

It appears, however, that both sides delve too far into the minutiae regarding the process by which FAR 15.305(b) was promulgated and thus miss the key point on delegation: the Constitution vests the Executive power in the President. U.S. CONST., Art. II, § 1, cl. 1 ("The

---

[8] *Madison Servs., Inc. v. United States*, 92 Fed. Cl. 120, 126 n.3 (2010) ("[T]here is no meaningful distinction between the decision to 'reject all bids' or to 'cancel the entire solicitation.' Accordingly, FAR 15.305(b) is fairly read to provide a general standard governing the cancellation of a negotiated procurement, whether because no proposal met the government's needs or because those needs themselves have changed.").

executive Power shall be vested in a President of the United States of America."). As Justice Scalia observed, "this does not mean *some of* the executive power, but *all of* the executive power." *Morrison v. Olson*, 487 U.S. 654, 705 (1988) (Scalia, J., dissenting). Therefore, who was involved in promulgating the FAR or part 15 of the FAR is beside the point. As long as the FAR Council was under the President's direction and control when promulgating FAR 15.305, the FAR Council can exercise the authority in 10 U.S.C. § 3065 to delegate the solicitation cancellation authority to the source selection authority for the Executive Branch as a whole because "Article II confers on the President 'the general administrative control of those executing the laws.'" *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 492 (2010) (quoting *Myers v. United States*, 272 U.S. 52, 164 (1926)). It is as if the President accomplished the delegation himself because the President "occupies a unique position in the constitutional scheme," *Nixon v. Fitzgerald*, 457 U.S. 731, 749 (1982), as "the only person who alone composes a branch of government," *Trump v. Mazars USA, LLP*, 591 U.S. 848, 868 (2020). In our constitutional system, although "individual executive officials . . . still wield significant authority, . . . that authority remains subject to the ongoing supervision and control of the elected President." *Seila L. LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 224 (2020). The Framers of the Constitution "sought to encourage energetic, vigorous, decisive, and speedy execution of the laws by placing in the hands of a single, constitutionally indispensable, individual the ultimate authority that, in respect to the other branches, the Constitution divides among many." *Clinton v. Jones*, 520 U.S. 681, 712 (1997) (Breyer, J., concurring). While the Framers may have had an energetic and vigorous executive in mind for the "the protection of the community against foreign attacks," "the protection of property," and "the security of liberty," this unitary executive was also designed to ensure "the steady administration of the laws," including faithfully executing mundane tasks like promulgating the FAR pursuant to the statutory command of 41 U.S.C. § 1303. THE FEDERALIST NO. 70, at 362 (A. Hamilton) (George W. Carey & James McClellan eds., 2001).

Plaintiffs have not given the Court any reason to believe that the FAR Council somehow went rogue without presidential authority when it promulgated FAR 15.305(b). Rather, the FAR Council was exercising authority statutorily granted to it by Congress and the President. *See* 41 U.S.C. § 1303. It is not as though the Secretary of Education woke up one morning, decided that the Secretary of the Army was overworked, and therefore decided to delegate solicitation cancellation authority to the source selection authority. Instead, a group of Executive Branch officials, directly accountable to the President, exercised authority Congress and the President gave them. Therefore, arguments about who was or was not involved in the drafting of FAR 15.305(b) are misplaced. The delegation of authority at issue here is not a wolf, in sheep's clothing or otherwise. *See Morrison*, 487 U.S. at 699 (Scalia, J., dissenting) ("Frequently an issue of this sort will come before the Court clad, so to speak, in sheep's clothing: the potential of the asserted principle to effect important change in the equilibrium of power is not immediately evident, and must be discerned by a careful and perceptive analysis. But this wolf comes as a wolf."). Rather, it is simply an exercise of the Executive faithfully executing the statutory delegation authority provided in 10 U.S.C. § 3065. Absent some restriction on the President's authority to control the FAR Council, the FAR Council can delegate the head of the agency's authority to the source selection authority for the Department of Defense and the rest of the Executive Branch. The President, in turn, could have prohibited or rescinded the delegation, but thus far that has not occurred.

StraCon, however, argues that even if the delegation of authority in the FAR is proper generally, that delegation of authority has been re-delegated within the Army.  ECF No. 80 at 9–10.  According to StraCon, the Army Federal Acquisition Regulation Supplement ("AFARS") "indicates that the Secretary of the Army has designated the Assistant Secretary of the Army (Acquisition, Logistics and Technology) as a substitute for [the] 'head of the agency for contracting procurement matters pursuant to laws and regulations' and there is no evidence in the record or otherwise that the Assistant Secretary of the Army . . . delegated the Section 3301(b) authority to" the source selection authority.  *See* ECF No. 80 at 10 (quoting AFARS 5102.101); *see also* ECF No. 79 at 5.  StraCon rests this conclusion on two provisions in the AFARS.  First, it points to a definitions section, which defines the term "head of the agency" as "the Assistant Secretary of the Army (Acquisition, Logistics and Technology) when executing authorities of the head of the agency for contracting procurement matters pursuant to laws and regulations, as designated by the Secretary of the Army."  *See* ECF No. 80 at 10; AFARS 5102.101.  Second, StraCon points to AFARS Appendix GG, which contains a list of Army delegations of authority within the FAR, the Defense Federal Acquisition Regulation Supplement ("DFARS"), and AFARS.  ECF No. 80 at 10; AFARS app. GG.  StraCon argues that because "AFARS Appendix GG does not reference FAR 15.305(b) at all," this means that, for the Army, there is no delegation of solicitation cancellation authority below the head of the agency, which is defined as the Assistant Secretary of the Army (Acquisition, Logistics and Technology).  ECF No. 80 at 10.

Although StraCon's argument is creative, it has some missing pieces.  First, that the AFARS defines the "head of the agency" as the Assistant Secretary of the Army (Acquisition, Logistics and Technology) does not directly undermine the FAR's delegation of the solicitation cancellation authority to the source selection authority.  Read in its proper context, a general definition of "head of the agency" as the relevant Assistant Secretary does not somehow eliminate explicit delegations of head of the agency authority to other Army officials.  Rather, it means that when authority is delegated to the head of the agency, that authority is delegated to the relevant Assistant Secretary and not to the Secretary of the Army.  It does not mean, however, that if authority was given to the Secretary of the Army by statute and then delegated to the source selection authority by the FAR that it is, ipse dixit, redelegated to the Assistant Secretary simply based on a definition in the AFARS.  The FAR provides that solicitation cancellation authority is delegated to the source selection authority and thus that authority resides there despite the AFARS definition of "head of the agency."  If instead the FAR provided that the "head of the agency" had solicitation cancellation authority, the AFARS definition of "head of the agency" would apply and that authority would reside with the Assistant Secretary of the Army (Acquisition, Logistics and Technology).

Moreover, StraCon's argument conveniently ignores a clause in the AFARS provision on which it relies.  The AFARS definition of "head of the agency" provides that the relevant Assistant Secretary is the head of the agency "*when executing authorities* of the head of the agency for contracting procurement matters pursuant to laws and regulations, *as designated by the Secretary of the Army*."  AFARS 5102.101 (emphasis added).  But StraCon does not direct the Court to any evidence that the solicitation cancellation authority is an authority that has been designated by the Secretary of the Army to the relevant Assistant Secretary.  Furthermore, solicitation cancellation authority is not an authority of the head of the agency because the FAR,

which the AFARS supplements, places that authority in the hands of the source selection authority. If the Army wanted to redelegate over the FAR's delegation, it had to do so more directly than by inserting a seemingly unrelated definition in the AFARS. This leads to the second missing piece in StraCon's argument. StraCon attempts to make a strength out of the weakness in its argument that AFARS Appendix GG does not list the authority in FAR 15.305(b) in its compilation of Army delegations of authority. According to AFARS 5101.108-1, AFARS Appendix GG "outlines all [Army] delegations of authority within the FAR, DFARS and AFARS." But AFARS Appendix GG does not reference FAR 15.305(b). In other words, it appears that the solicitation cancellation authority has *not* been "designated by the Secretary of the Army" to reside with the Assistant Secretary of the Army (Acquisition, Logistics and Technology). Instead, it appears that the Army has left in place the FAR's delegation of that authority to the source selection authority, and StraCon has not met its burden to persuade the Court otherwise.

### b. "Public interest" versus "best interest of the Government"

Next, Plaintiffs contend that even if there was a valid delegation from the Secretary of the Army to the source selection authority, the cancellation here was nonetheless contrary to law because 10 U.S.C. § 3301(b) requires the cancellation decision to be in the "public interest" rather than in the "best interests of the government," as required by FAR 15.305(b). *See* ECF No. 72-1 at 32; ECF No. 73-1 at 23; ECF No. 74-1 at 18. *Compare* 10 U.S.C. § 3301(b), *with* 48 C.F.R. § 15.305(b). Plaintiffs focus on the fact that the two standards use different words and, therefore, according to Plaintiffs, focus on different interests. Plaintiffs essentially argue that "[w]hen a regulation directly contradicts a statute, the regulation must yield." *GHS Health Maint. Org., Inc. v. United States*, 536 F.3d 1293, 1297 (Fed. Cir. 2008).

The problem with Plaintiffs' argument is two-fold. First, it is not clear that the statute and the FAR provision are directly contradictory. There is no doubt that the words used in FAR 15.305(b) could have better aligned with the statutory text. Both 10 U.S.C. § 3301 and its civilian procurement analog 41 U.S.C. § 3701 use the term "public interest," not the FAR's "best interest of the Government" phraseology. However, it would appear that the concentric circles around the terms "public interest" and "best interests of the Government" align, or at least sufficiently align so that a cancellation that is in the best interest of the government is also within the public interest. While this issue would potentially be clearer if the FAR defined "best interest of the Government" or the statute defined "public interest," these terms do not necessarily conflict and may be interpreted to either mean the same thing or at least overlap in certain circumstances. For instance, as the Supreme Court has observed, courts "may presume, absent a showing to the contrary, that [a government] acts in the public interest. A private party, on the other hand, may be presumed to be acting primarily on his or its own behalf." *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 501 (1988) (alteration in original) (quoting *Hallie v. Eau Claire*, 471 U.S. 34, 45 (1985)).

Plaintiffs attempt to sidestep this reality by pointing to the injunctive relief test and arguing that the standards for granting injunctive relief require the Court to separately consider how injunctive relief would affect the parties (e.g., the Government), as well as "whether the injunction serves the public interest." *PGBA, LLC*, 389 F.3d at 1228-29; ECF No. 74-1 at 18–

27

19; *see also* ECF No. 73-1 at 23.  However, as the Supreme Court has pointed out, "[o]nce an applicant satisfies the first two factors, the traditional stay inquiry calls for assessing the harm to the opposing party and weighing the public interest.  These factors merge when the Government is the opposing party."  *Nken v. Holder*, 556 U.S. 418, 435 (2009).  In other words, the public interest and the government's interest are not necessarily distinct.

The second problem with Plaintiffs' argument is that the source selection authority did, at least partially, find that cancellation would be in the public interest.  In the cancellation memorandum, the source selection authority states that "[t]he public interest is best served when multiple award contracts are used" and, therefore, he rejected all proposals and cancelled the solicitation.  Tab 18 at AR 1239.  While this is not the most definitive statement, when read in the context of the cancellation memorandum as a whole, it does appear that the source selection authority was concerned with the public interest in cancelling the solicitation in accordance with the statutory mandate of 10 U.S.C. § 3301.

All that being said, while it may be the case that the public interest and the best interest of the government do not always perfectly align, at least for purposes of the cancellation memorandum at issue here it appears that there is sufficient alignment of the two interests.  Plaintiffs' argument is essentially a facial challenge to the use of the term "best interest of the Government" in FAR 15.305(b), but in this case, at least, it appears that the specific facts of the cancellation decision support the argument that the cancellation decision was in the public interest, and Plaintiffs' essentially facial challenge does not sufficiently show otherwise.

### 4.    The Agency's Procurement Errors Entitle Plaintiffs to Injunctive Relief.

Plaintiffs seek an order from the Court enjoining the cancellation of the SETA III solicitation.  *See* ECF No. 72-1 at 28–34; ECF No. 73-1 at 38–40; ECF No. 74-1 at 38–40.  In a bid protest, this Court "may award any relief that the court considers proper, including declaratory and injunctive relief . . . ."  28 U.S.C. § 1491(b)(2).  To determine whether a permanent injunction should issue, the Court considers:

> (1) whether, as it must, the plaintiff has succeeded on the merits of the case; (2) whether the plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) whether the balance of hardships to the respective parties favors the grant of injunctive relief; and (4) whether it is in the public interest to grant injunctive relief.

*PGBA, LLC*, 389 F.3d at 1228–29.  "No one factor, taken individually, is necessarily dispositive.  If a[n] . . . injunction is granted by the trial court, the weakness of the showing regarding one factor may be overborne by the strength of the others."  *FMC Corp. v. United States*, 3 F.3d 424, 427 (Fed. Cir. 1993).

Plaintiffs have succeeded on the merits of their protest, and they assert that the rest of the injunctive relief factors weigh in favor of injunctive relief.  Specifically, Plaintiffs assert that the cancellation decision deprives them of the chance to compete for and receive the benefits of the proposed solicitation.  ECF No. 72-1 at 33–34; ECF No. 73-1 at 39; ECF No. 74-1 at 38–39.

Furthermore, Plaintiffs contend that they will be irreparably harmed by the loss of the opportunity to compete for the solicitation and resources already expended to prepare their bids, *see, e.g.*, ECF No. 74-1 at 38–39, while the agency will be minimally affected by adhering to its obligations to follow the law and, if enjoined, will merely be reinstating its own RFP, consistent with its own procurement practices, *see, e.g.*, ECF No. 73-1 at 39. Moreover, according to Plaintiffs, the public interest is served by an injunction because "the public has a strong interest in preserving the integrity of the procurement process." ECF No. 73-1 at 39 (quoting *United Int'l Investigative Servs., Inc. v. United States*, 41 Fed. Cl. 312, 323 (1998)). The government counters that the harm to Plaintiffs is minimal because the agency "would retain the option of making multiple awards under the IDIQ format . . . ." ECF No. 77 at 47. Additionally, the government argues that "there is a public interest in 'minimizing disruption to the agency,'" and enjoining the cancellation would allow Plaintiffs to dictate the agency's acquisition strategy. *Id.* at 48 (quoting *Akal Sec., Inc. v. United States*, 87 Fed. Cl. 311, 321 (2009)).

Plaintiffs satisfy all the remaining three injunctive relief factors. First, Plaintiffs have established that they will suffer irreparable harm absent injunctive relief. "[A] lost opportunity to compete for a contract—and the attendant inability to obtain the profits expected from the contract—can constitute irreparable injury." *Bluewater Mgmt. Grp., LLC v. United States*, 150 Fed. Cl. 588, 619 (2020). And the cancellation of a solicitation, particularly on grounds that are irrational, plainly constitutes a "lost opportunity to compete for a contract." The government's argument that the harm to Plaintiffs is minimal because the agency "retain[s] the option of making multiple awards under the IDIQ format, with a guaranteed minimum of either $50,000 or the first order's value," regardless of an injunction, is unavailing. ECF No. 77 at 47. The government appears to argue that this Court could not enjoin an ID/IQ contract because the administration of the contract is subject to agency discretion. However, this is not the case. Beyond the speculative nature of this argument, judges of this Court have previously enjoined the cancellation of ID/IQ awards. *See, e.g.*, *Maucaulay-Brown, Inc. v. United States*, 125 Fed. Cl. 591, 594, 606–07 (2016); *Serco Inc. v. United States*, 81 Fed. Cl. 463, 466, 503 (2008). Accordingly, the balance of hardships also favors granting of injunctive relief. The government characterizes the potential harm to Plaintiffs as "minimal, and not irreparable." ECF No. 77 at 48. However, Plaintiffs have lost the opportunity to compete for, and benefit from, an award. Moreover, Plaintiffs have also expended time and resources to prepare their proposals. Conversely, an injunction would only require the agency's actions to be consistent with procurement law.

Finally, the public interest favors injunctive relief. The public interest favors preserving the integrity of the procurement process. *See, e.g.*, *Bona Fide Conglomerate, Inc. v. United States*, 96 Fed. Cl. 233, 242 (2010) ("There is an overriding public interest in preserving the integrity of the procurement process by requiring the Government to follow its procurement regulations."). Contrary to the government's contention that granting injunctive relief would allow Plaintiffs to dictate the agency's acquisition strategy, an injunction would not be so ambitious. Plaintiffs have established that the agency violated procurement law in its cancellation decision. An injunction would merely require the agency to follow procurement law and ensure the integrity of the procurement process. Having established all four prongs of the injunctive relief test, Plaintiffs are entitled to a permanent injunction.

**CONCLUSION**

For the reasons discussed above, the agency's decision to cancel the procurement at issue here is held unlawful and set aside.  The government has expressed to the Court that regardless of the outcome of this protest, it no longer wishes to procure the services it needs through the SETA III vehicle.  *See* ECF No. 95 at 2.  While that may be the case, the government must nonetheless reinstate the SETA III procurement and, if it so chooses, cancel it in a manner that is not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  *See Regents of the Univ. of Cal*, 591 U.S. at 22 (holding that "[p]rocedural requirements" are not "an idle and useless formality") (internal quotations omitted).  To that end, the Court orders the following:

1. The government's cross-motion for judgment on the administrative record is **DENIED**.

2. TAPE, StraCon, and Mayvin's motions for judgment on the administrative record are **GRANTED**, and their requests for injunctive relief are **GRANTED**.

3. The United States, by and through the Department of Defense, its officers, agents, and employees, and all other persons acting in concert and participating with them respecting the procurement under RFP No. W900KK-21-R-0035, is hereby **PERMANENTLY RESTRAINED AND ENJOINED** from cancelling the SETA III solicitation (RFP No. W900KK-21-R-0035) in a manner that is inconsistent with this opinion or the limits on agency action after an agency's initial grounds for taking agency action have been found inadequate.  *See Regents of the Univ. of Cal*, 591 U.S. at 20–21.

4. The parties shall confer to determine agreed-to proposed redactions to this opinion. On or before August 8, 2025, the parties **SHALL** file a joint status report indicating their agreement on proposed redactions, attaching a copy of those pages of the Court's opinion that contain proposed redactions, with all proposed redactions clearly indicated.

5. The Clerk shall **ENTER** judgment accordingly.

**IT IS SO ORDERED**.

s/ Zachary N. Somers
ZACHARY N. SOMERS
Judge